When I talk to juries about doing their job when I'm closing, I talk to them about how innocent people get convicted of horrible crimes. And I tell them, because this is what I believe, that innocent people get convicted of horrible crimes because the people in the system don't do their jobs. And that starts with the investigation, it goes to the prosecutors, it goes to the defense attorneys, judges, and ultimately, when juries don't do their jobs. And that's... But, Ms. Holden, you know I have a lot of respect for you. But the problem I have with this, it's a hypothetical. Actual innocence, of course, is a compelling thing. And at least one circuit has said that that will equitably toll the requirement here. But how does your client prove actual innocence? He's thrown some distinguishing things that might be impeachment evidence on the wall. He's raised this concern, raised that concern. But where's the showing of actual innocence? Where's the new evidence that meets the Schlepp standard? I don't see it. The evidence in this case, well, I think House talks to that. And I think that House actually answers most of those procedural questions in this case. But the House case talks about what kind, what is new evidence. And it first starts with... Well, forgive me, I understand your point about House. But I'm talking about in this case the actual evidence. Where is the evidence of real, actual innocence in this case? I don't see anything in the record here that speaks to your client's actual innocence. As I said, there's lots and lots of things that talk about what I would call impeachment evidence or evidence that will perhaps raise some question in the mind of a jury. But we're well past that now. We're talking now about if there's actual evidence. So if you had somebody that was convicted of a rape and it turns out that there's DNA evidence that shows that it couldn't possibly be your client. It wasn't available before, something like that. Now, that's different. What in the evidence here shows that there was actual evidence? So we even get to the questions that you would like to raise on your appeal. Well, in this case there was absolutely no physical evidence connecting Mary Weaver to this offense. But what we were able to do 15 years later was to... And that actual innocent standard isn't the substantive actual innocent standard of Herrera. It's a would a reasonable jury find... A juror find this person guilty beyond a reasonable doubt. No, no, isn't it the other way around? Isn't it that no reasonable jury could find... Juror could find the person guilty basically in this case. But if the jurors... I think that if any juror heard the evidence in this case in the proper context and knew what Shorty Dye had when he started writing to law enforcement, was told that nothing that he told law enforcement was not in that newspaper... But you're just trying to retry the case. I think that on some level the actual innocent standard of Schleppenhaus... When you're talking about whether any reasonable juror could find this person guilty beyond a reasonable doubt, what you're talking about is the evidence that's presented in a case and how that evidence was misrepresented, other evidence that could have been presented, evidence that the defense attorney had in her hands but didn't do anything about. All of that is new evidence under the House standard. But I think what you're arguing in response to Judge Smith's question is legal insufficiency, that the evidence would not permit a rational jury to find by proof beyond a reasonable doubt that Weaver committed the murder. The Supreme Court said in Bowlesley that actual innocence means factual innocence, not mere legal insufficiency. And I'm having a hard time understanding, as Judge Smith was suggesting, why you weren't basically just retrying the case on the basis of stronger impeachment evidence than may have been available the first time around. I mean, you got a lot from Judge Malloy in terms of that hearing. Well, the factual evidence in this case, though, is that there are three other people who essentially confessed to this crime. But your client confessed to three other people as well. He certainly made damning admissions when he was under the influence of intoxicants. I don't think that House requires that we have no bad evidence, but my client, Mr. Weaver, never said, I killed Jim Fremo. Dale Wallace and Gina Rochelle and Marvin Brandvold all said he killed somebody. He said he killed somebody, but he didn't say he killed Jim Fremo. I mean, maybe we should jail everybody who confessed to the Weaver, and then we'd know we got the right person for sure. But the problem here is he did make admissions out of his own lips, which tend to corroborate what Shorty Dye said and which was corroborated by the crime scene evidence and the autopsy. So why doesn't that just go, as Judge Smith was suggesting, to additional impeachment evidence as opposed to proof of actual innocence? Well, if you look at the quality of what Weaver said compared to, for example, what Dale Wallace said, and if the jury had known that Dale Wallace had actually pinpointed the exact place where the body was found, even though Captain Krigo indicated that that wasn't the fact, if the jury had been aware of the emotion with which Dale Wallace confessed, if they had known, and again where Captain Krigo misrepresented the evidence to the jury, that Gina Rochelle and Dale Wallace had a beef against Jim Fremo because there was the belief in this group that he sexually molested these children. But didn't some of that evidence come out at the trial? I mean, I was trying to parse through what's truly new and what's sort of adding an additional gloss on what the jury already heard. What came out at the trial was that, oh, yeah, Dale said this. And then Captain Krigo said, well, but then he told other people that he made this confession. But then when I talked to him, he said he didn't do it, and I just had to accept that. And then when he gets up at trial – Ms. Borg, the defender, explained that the reason that, from a tactical standpoint, that she preferred to do it that way, to get that evidence in through cross-examination with Captain Krigo, was she wasn't going to take the risk of calling a Wallace to the stand, ask him in front of the jury, isn't it true that you, sir, are the murderer, and then have him say, absolutely not, I didn't do it. Well, if you're going to do it the way that she did it, then you also put in that he's having nightmares, that you put him in the right location. You talk about – you don't let Captain Krigo explain away the fact that there's no problems with his speech, that he says, no, absolutely, there's no evidence that these children were sexually abused. You don't let him imply that Dale Wallace didn't have him in the right location. If you were going to use that tactic, then you get the evidence right. And when they try to back up on you, you say, but wait a second, in this report, didn't you say this? You don't let them sanitize. This all goes to the merits of the underlying constitutional – alleged constitutional violations and effective assistance of counsel, correct? They are different claims in this case. Right, but you've got to get through the door first. Right. I would like you to tell me what new evidence there is that you would present at a new trial that would support your claim of actual innocence. What's the new evidence? I would put in that Dye had that newspaper article before he wrote the letter. Okay, let's talk about the newspaper articles for just a minute. Pardon? Let's talk about the newspaper articles. Now, there was some discussion at the trial about the newspaper articles, correct? Except that Dye was allowed to imply that the newspaper – I don't know. My question was there was some discussion at the trial about the newspaper articles, right? There was some discussion – In fact, three of them were admitted into evidence, correct? Yes. All right. Now, do we know – do you know – can you tell me today which article it was that Mr. Dye saw or read before he met with the local sheriff who came to visit him? I am confident that it is that first article that was Exhibit 1 at the evidentiary hearing. How do we know that? Because in the context of that first letter that he wrote. And I think that that's – if you look at Captain Krigo's testimony at the evidentiary hearing, I think it's certainly implicit in that. Okay. At trial, though, we know that Dye testified that – I think it's at trial. Maybe at the evidentiary hearing. Correct me if I'm wrong, but he testified that Weaver sent him an article. The first time he ever saw an article was when Weaver sent him an article and his name – Dye's name was in the article, and that's why Weaver had sent him the article, because Dye's name was – And the only reason Dye's name would be in an article is because he had already talked to law enforcement. But that had happened years later, correct? Dye talked to law enforcement about three years after the fact. About three years later. Yes, but – So at trial, Dye testified that he hadn't seen any articles. No, he testified that he had seen an article with his name in it, but in his first – You're correct. I'm sorry. He didn't point to any articles around the time of the killing. And in his first interview with Officer Davenport down in Georgia, he – in the first interview, he indicated that he had a newspaper article. That was before Weaver was ever charged, before there were ever any newspaper articles with his name in them. Well, that was all brought out at trial, though. I mean, it wasn't – I shouldn't say that wasn't brought out at trial, but – But he was a law enforcement officer, correct? Yes. And wasn't he thoroughly cross-examined? No. He wasn't. He was cross-examined, certainly not effectively or thoroughly. Well, I gather you would do it differently now, knowing what you know. And frankly, as you – I mean, there was never an opportunity to impeach him with all of this. Yes. Correct? Yes. At least with the articles that they had at the time. Yes. But that doesn't make this not new evidence. But, Ms. Holden-Knight, with all respect, Judge Piazza just asked you what new evidence there was. You brought out the newspaper article. He's pointed out that the newspaper article was talked about at trial. And as you know, and I'm quoting from Schlupp, it must be new, reliable evidence, whether it be exculpatory, scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial. But House – I know about House, but I'm simply saying that the whole concept of Schlupp is, if you've got a real miscarriage of justice here, some evidence comes up that shows that this person just couldn't have done this. This is just wrong. That's what this is about. But being the able advocate that you are, if what you're really doing is saying, you know, I'd have tried this, or whoever tried it, this should have been tried differently. We'd like to present the evidence to a different jury, spin it a little different way. But that's not what the – that's not what Schlupp is about. That's not the actual innocent standard, not the standing house. I think that the evidence that the jury heard in this case was misleading, and this is a miscarriage of justice. That's the whole purpose of defense counsel in a criminal trial, though, is to make certain that any evidence presented by the government is cross-examined, examined in any way it could possibly be done by the defense counsel to show that the evidence is misleading or incorrect in some other way. You can argue whether defense counsel did a good or a bad job, but I know since you have an IAC claim you'd like to bring, you think that defense counsel did a very bad job. But the fact is, almost every criminal trial runs that risk. That's just – we're all humans. People do a better or a worse job. But you cannot get past the AEDPA problem here unless you've got a real, clear, exculpatory set of new evidence that's going to get your client off. And I – honestly, I don't – where's the new evidence? I've gone through all this information. I've got pages and pages and pages of notes, and in every instance you've got a little gloss here and you've got a little gloss there, but it was all in there before. It's just a question of how you want to look at it. I don't see any new evidence that is exculpatory. Where am I missing something? I think that the jury was presented with evidence that was incorrect. To correct that evidence is new evidence. Well, okay, I understand your semantic difference, but what is exculpatory of your client? It's not clearly scientifically or otherwise exculpatory. You're saying you think it would influence the way the jury would view the evidence. But it is not, is it, clearly exculpatory of your client? The fact that not one single – that Shorty Dye was not able to give law enforcement one single piece of physical evidence that panned out that was not in that newspaper article. In addition to the other things that were – I want to be clear about one thing. When we talk about that newspaper article, at the evidence you're hearing there was an Exhibit 1 admitted, which was a newspaper article. Right. And it was dated Saturday, the 13th of November, 1993. Right. Was that newspaper article admitted at trial? I don't believe so, Your Honor. I will tell you I am not positive whether or not. You've been writing this record for a lot longer than I have, correct? I have been, yes. I don't believe so. You can't tell me today that this article was – I could if I went through my record. When you go to the actual trial transcript, okay, on February 9th, 1998 at the trial, there's a reference made to three newspaper articles that were admitted at the trial. There were Exhibits – States Exhibit 21, States Exhibit 22, and States Exhibit 23. And States Exhibit 23 is a November 8th. November 13th. Yes. So you don't have – so this article was not admitted? I guess not. No. States 23 is a November 13th newspaper article. And that's that one. The same one? Yes. That's the only one. Pardon? So it was – so it was admitted at trial? Yes. Yes. With that record, yes. It's the only record we have. Yeah. Well, I just couldn't remember any more. Ms. Holton, before you sit down, let me ask you a policy question. We have heretofore ducked the issue as to whether entitlement to pass through the Schlupp Gateway requires proof of due diligence. Should we resolve that question in this case? I think House resolves that question. House talks about how the 2254 requirements don't apply to an actual innocence claim. So I think that House answers that question. Okay. All right. Thank you. May it please the Court. My name is Mark Fowler. I'm Assistant Attorney General for the State of Montana. I'm going to the matter that Judge Talman just raised. The State disagrees with that characterization of House. Shot. I knew you would take that position. I'm likewise stunned. House, of course, does not answer that. The 2254 in House was an actual innocence claim that was brought in the regarding a procedural default. The Court left open whether or not it would apply, the same analysis apply to the procedural bar that's presented by statute of limitations. That's still an open question. And to, like, sort of ---- Those are hard questions. You may not need to get there, correct? No, Your Honor. You may not. And the State will admit that you need not, which is the first argument of the State's brief, you need not reach that issue if you find there's absolutely no basis to pursue an actual innocence claim. So we should just let that one lie for some future panel. Your Honor, I would like to be a good advocate in perhaps parroting another advocate earlier this morning who said I'm asking a lot. And I would ask Your Honors to consider making a declaration clarifying the law regarding actual innocence as it relates to statute of limitations. Well, let me ask you this. If, arguendo, we could find no new evidence, nothing that meets the Schlepp standard, however modified by House, that would show that Mr. Weaver is actually innocent under the Schlepp standard. If that's what we find in the record, we don't have to get into any of the rest of this, do we? Isn't that the end of the story? Yes, this appeal ends, if I understand your question. This appeal ends if you make a determination. There is not a showing at the threshold of the gateway. Yeah, exactly. So in other words, we don't even need to get to all the other policy issues and so on. If, when you look at the totality of the evidence, there's just no evidence that would meet the Schlepp standard. End of story, right? Yes, Your Honor. Clearly, clearly, as a judicial economy, there's no reason to waste any time. Well, let's talk about judicial economy because it's not easy to resolve claims of actual innocence. And this case is a good example. I think Ms. Holton has done a pretty good job of marshalling some arguments here that maybe her client is innocent. Does that mean that every time a habeas petitioner comes to federal court and says, I'm actually innocent, he or she is entitled to a full evidentiary hearing, as Judge Malloy ordered in this case, without any showing that he has diligently pursued his claim heretofore? If I understand your question, it should not be the case that a habeas claimant comes forth an actual innocence claim and is not able to show basic elements of equitable tolling that the Supreme Court has stated. One, that the petitioner has been duly, diligently pursuing their right to stay in court. And two, there's some extraordinary circumstance that prevented that petitioner from raising the claim. Where would a – in what case would a petitioner not be able to show that already? It should be the requirement of all habeas petitioners who claim actual innocence to have the – I would like to call it the threshold of the gateway analysis to show I could not bring this for this reason. Particularly as an example, House in Tennessee, who perhaps didn't have the available DNA evidence of the blood and urine showing that the victim's husband, not he, committed the crime, the rape and the murder, as well as two other witnesses who I believe recanted some of the testimony under oath. And Weaver made no effort to explain why he took this long to bring his claim, did he? Your Honor, no. Not only did not make any effort to explain why it took so long, not make an explanation why, in fact, those claims – I should be careful not to say legal claim, but those contentions about innocence were raised in the State court. These are – the factual contentions of innocence here are the same claim raised in the trial court in a motion for new trial that was entered pro se by Mr. Weaver claiming he could be exonerated if the 16 other witnesses came forward. It was the same claim raised, admittedly via a Strickland v. Washington analysis of ineffective assistance of counsel in post-conviction, but they were the same claims. Not enough witnesses came forward. These other witnesses should have been pursued with live testimony. It would have had a greater emotional impact. And the Montana Supreme Court said no, no, that will not get you anywhere. It is for that reason the State here, as a policy consideration, would ask the Court to at least look at this case as perhaps the vehicle in which to clarify the law of actual innocence because of the waste of judicial resources, because Schlepp is not a document announcement of jurisdiction that sits outside AEDPA for some reason, that the habeas court is exercising habeas jurisdiction completely outside AEDPA. Now, House did clarify that AEDPA does not supplant the analysis in Schlepp. However, that doesn't mean AEDPA is totally irrelevant, particularly the standards of deference under 2254e. These are hard. These policy questions are difficult issues. My own preference is if I don't have to go there, I prefer not to. But we'll see. That's just my own sort of sense. But what I'm interested in, the way I see it, what strikes me about the claim here for Gateway is the attack is really on Mr. Dodd. Correct. Mr. Dodd was a part of the State's case. I mean, there was all this other evidence about these other characters. But the main one that puts the case over the line is the advised testimony. Granted. And so the attack here is on Mr. Dodd. Yes. And the claim is that they've got new evidence to show that Mr. Dodd was a liar, that he lied through his teeth, that he lied through his teeth so he could get the benefits of the deal in his own situation and whatnot. Now, Mr. Dodd testified at the trial, correct? And the whole attack here is that, well, he knew about this. The reason why he was able to come off with this story was because he knew about this murder and he had the details of the murder by reading the newspaper articles. We were supplied them. Yes. Now, when I read, you know, I tried my best to try to figure out what happened at the trial and look at the newspaper articles and the claims that have been raised in this proceeding. It looks, you really can't tell, other than through his own testimony at trial, what articles he may have actually considered or read. At the trial, he only testified that he had read an article that had been presented to him by Mr. Weaver. And that was the only article that Mr. Weaver sent him where his name was mentioned, that that doesn't help Mr. Weaver's case at all. And there's no evidence at the trial, as far as I can tell, as to which articles he may have read or had before him, before he even met with the investigator. With respect, no, Your Honor. I think there is evidence here to indicate, and the State would agree with Ms. Holton, that it's the November 13th article in the Missoulian by Michael Moore, which at least that has been shown was probably the article that is referred to among State's exhibits 2021, 22, and 23. I believe the other exhibits simply were not found in the habeas proceedings to present to the Court. But the evidence of exactly what was mentioned can be inferred from the closing argument of the State's counsel, particularly Josh Vander Weitering, who is now a USA familiar with Mr. Vander Weitering. But in the rebuttal argument, you can determine this point-by-point analysis of what was in Dye's testimony that was not in the media. And I can go over them for you clearly here today, if you wish. And that was presented to the jury. So I think by inference, you can deduce what article is referred to. But did Dye – is there evidence, though, that Dye actually had that article, that he read that article before he met and he investigated it? It's said that there's evidence in the record at trial – the trial record at 495 would be your electronic PDF page 124 – that Weaver sent the article after Dye sent his first letter to Detective Krieger, which would have been October 10, 1995. And so the article was sent, according to this portion of the transcript, after Dye had sent the first letter to Krieger, indicating all these facts. What's most pertinent, of course, turn your attention to Dye's testimony, if you will, Your Honor, that all these other confessions, these other witnesses and suspects occur after the body is found November 17. And you're well aware of that. What's critical here, which is never discussed by a petitioner in any of the briefing or the hearing or here today, really effectively, I think, is the fact that Weaver had confessed to killing a person and covering it up with brush. And that conversation occurred before the body was found. And it occurred somewhere between October 17 and October 31, 1993. The body was found about a week or two later. And there are additional facts that were fleshed out that also tie in and actually strengthen the case of the State. So to some degree, the State not believing that a hearing should have taken place, so it was somewhat of a debt of gratitude to Judge Malloy for actually making the State's case stronger. Your Honor, if you have any more questions about the details of the record, specifically in regard to Dye's testimony, I'd be happy to try to answer them. The only question I have is your response to Judge Pius's question and your earlier comments suggest that, indeed, what I was suggesting earlier, your opposing counsel, all of this evidence was introduced at the trial. What you're really looking at here is a different spin on the same information. Is there anything that you see in the record brought in by Mr. Weaver that suggests that there is new exculpatory evidence of any kind that has been brought into the record here that would meet a schlup standard? No. By a fair reading of schlup and what exactly is new evidence, there is no new evidence here, Your Honor. There is new delivery of evidence. There is a stronger jury summation by a very capable trial attorney and appellate advocate, but a stronger jury summation of greater rhetorical vigor does not make an actual instance showing. And for that reason, Your Honors, we would – the State of Montana would ask that you please affirm the denial based upon the statute of limitations. Schlup doesn't give defendants the right to a new trial because they think it should have been tried differently, does it? Not at all, Your Honor. Specifically because of the very nature of the actual instance showing in the longstanding jurisprudence of habeas that the concentration of societal resources at a moment in time before a jury, still within the realm of human fallibility, is a critical, decisive event. If the Court were to allow this type of showing to expand the schlup standard, then effectively, habeas courts become screening vehicles for circumstantial evidence cases in State trials. You know, I guess what I was trying to get at was I had thought when I first looked at this that the claim was, the new evidence, and the use of the sentence to die, was that it wasn't clear at the trial that he had actually seen newspaper articles about the murder, and that the new evidence was that, ah, yes, we can show that he did, but in fact, what it seems to show is that he almost was brought out of the trial, or settled with the trial. Your Honor, there are several significant facts brought forth in the October 10th first letter to Detective Krigo that were not in the newspaper article before this Court, which is the November 13th article. And those were verified, if not, there was evidence produced that strongly suggested the strong credibility in the entire story that Dye told, and consistently told, not just to Detective Krigo in the letter, but to Detective Davenport, the local sheriff in Georgia, and then again to Detective Krigo when Krigo went to Georgia, and then before the jury. It's a consistent story full of facts that only the murderer would know, that is not revealed in the November 13th article. Right. Several significant facts, including the old army rifle, the Czechoslovakian rifle that was pawned on October the 11th, it was indisputably pawned by a gentleman who was close friends with Weaver. The location, the terrain was looked at by the investigators and testified at trial that it matched Dye's story about the location of the body where the body was dumped from a high vantage point looking down to see, I mean, exactly conformed to the way that Dye's story panned out. And while there was not a fireplace found where the actual murder site was, Dye talked about that the body was moved a quarter mile from the place that Freemu died, the place where the body was found, and that there was a creek running by the place of the murder that where Weaver had washed his hands. There is, in fact, a creek there. I mean, there are copious other facts. Your Honor, thank you. Thank you. I'll give you, yeah, two minutes. No, just two minutes. Thank you, Your Honor. Regarding the question on whether the AEPA standards apply, I briefed that there's a whole series in my briefing on that, but I would direct the Court to Headnote 8 in the House case. It would be at 2270, 2078. Where they talk, where the Supreme Court talks about the statutory requirements of AEPA, and then talks about how those do not apply to, it's talking about third convincing evidence on the second or subsequent petition. And then, and also the evidentiary hearing. And Justice Kennedy says, Neither provision addresses the type of petition at issue here. A first Federal habeas petition seeking consideration of defaulted claims based on short or valid dismissals. Thus, the standard of review in these provisions is inapplicable. And cites Lockhart v. Thomas for the proposition that dismissal of a first Federal habeas petition is a particularly serious matter. I think that that goes to the point made by this Court in Majoi that those, that this is an exception to those, the actual innocence standards, this is an exception to those statutory requirements. But the statutory scheme, and you find it throughout AEDPA, speaks of both due diligence and facts that would not convince a trier that the defendant was guilty. And I'm, I'm still having a hard time why you want to write out the due diligence requirement. As I argue in my brief, when, when the Congress enacted those provisions of AEDPA, it legislated against the backdrop of Schlupp. And they put those due diligence requirements into a second or subsequent proceeding. They left them out of the first. What, what, what, what? You're saying that Congress legislated against the background of Schlupp when it passed AEDPA? When it put in those new, those provisions, yes, on the second or subsequent provisions. And I, there's, if I go to, it's in my reply brief, I believe, at pages 7 and 8, where I discuss, where this Court, I think, discussed it in Majoi, and then more recently in Johnson v. Knowles. Let's see. And regarding, I, I respectfully disagree with, with Mr. Fowler. I don't, I think it's very clear from the first interview with Davenport and Shorty Dye that Shorty Dye had access to that November 13th article prior to the time that he wrote that initial letter to Schlupp. But I disagree. But your point is that the, that the, the original letter was, was in the October 13th article, and that in the October 13th letter to Captain Krego, there were details that only the killer could know, which were not included in the subsequent. And I addressed that in my reply brief, Your Honor, where we, the only things that could be, that could be documented were what was in that article. Everything else is, is something that you could make up with a vivid imagination or, frankly, that just didn't pan out. And, and I argue that in my reply brief. Roberts. We'll take a look at it. Thank you very much. Thank you. It was very, very helpful. Our next case for argument is Confederated Tribes of the Colville. Indian Reservation versus the Confederated Tribes and Bands of the Yakama Indian Nation.
judges: Paez, Tallman, Smith M.